**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| BRETT RAIO, PEREZ NDI, and REETIK DHAMALA, | |
| *Plaintiffs,* | |
| *v.* | |
| The CITY OF CHICAGO, an Illinois municipal corporation, and Chicago Police Officers MARIO L. JACKSON, NICO A. SUTOR, CARLOS R. CAMEY SANDOVAL, MICHAEL P. JOYCE, WILLIAM E. GATLIN, and MICHAEL PETRASKI in their official and individual capacities. | Case No. 1:25-cv-02709<br><br>**The Hon. Sara L. Ellis** |
| *Defendants.* | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

STATEMENT OF FACTS ..................................................................................... 1

STANDARD OF REVIEW .................................................................................... 4

ARGUMENT ......................................................................................................... 4

    I.   Defendants Cannot Rely on Material Not Before This Court. ............................. 4

        A. Video Footage Upon Which Defendants' Rely Is Not Referenced in the Complaint. ............................................................................. 4

        B. The Body Camera Footage Does Not "Blatantly Contradict" Plaintiffs' Allegations and is Not Subject to Judicial Notice. ............................ 6

        C. Defendants' Own Characterizations of the Footage Support Plaintiffs' Claims. ............................................................................................ 7

    II.  The *Monell* Doctrine Provides No Obstacle to Plaintiffs' Claims (Counts I-IV, VI-VII). .................................................................................... 7

    III. Plaintiffs' Facial Challenge to Chicago Ordinance § 8-32-070 Should Proceed (Counts III and VIII). ............................................................ 11

        A. The Void-for-Vagueness Doctrine Applies Heightened Scrutiny to Laws Affecting First Amendment Rights. ............................................... 11

        B. Chicago Ordinance § 8-32-070 Fails to Provide Fair Notice Through Objective Standards. ........................................................................ 12

        C. The Ordinance's Subjective Standards Invite Arbitrary and Discriminatory Enforcement. ....................................................................... 14

        D. The Ordinance's Vagueness Chills Protected Speech by Restricting Access to Amplification. ........................................................... 15

    IV. Plaintiffs Adequately Allege an As-Applied Violation of their Free Speech rights (Counts I and VII). .................................................................. 15

        A. Defendants' Selective Enforcement Constitutes Content-Based Discrimination. ............................................................................................. 16

        B. Plaintiffs Have Adequately Alleged Retaliation. ........................................ 19

    V.  Plaintiffs Adequately Allege an As-Applied Violation of their Free Exercise rights (Count II). ........................................................................... 20

    VI. Plaintiffs Adequately Allege an Equal Protection Claim (Count IV). ................... 22

VII.     Plaintiffs Adequately Allege a Fourth Amendment False Arrest
         Claim (Count VII). .................................................................................................24

VIII.    Qualified Immunity Does Not Protect the Individual Defendants
         (Counts I-IV, VI-VII). ...........................................................................................25

IX. Plaintiffs Have Adequately Alleged An IRFRA Claim (Count V). .......................26

CONCLUSION ........................................................................................................................27

# TABLE OF AUTHORITIES

**Cases**

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970) ...................................................8

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......................................................................4

*Bell v. Clackamas County*, 341 F.3d 858 (9th Cir. 2003) ...........................................19

*Bogie v. Rosenberg*, 705 F.3d 603 (7th Cir. 2013)........................................................6

*Brown v. City of San Diego*, No. 3:17-CV-00600-H-WVG, 2017 U.S. Dist. LEXIS 146888 (S.D. Cal. Sept. 11, 2017)...................................................................................6

*Brown v. Kemp*, 86 F.4th 745 (7th Cir. 2023)........................................................11, 12

*Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687 (7th Cir. 2012).................5

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014)..........................................21

*Calusinski v. Kruger*, 24 F.3d 931 (7th Cir. 1994)......................................................10

*Coates v. Cincinnati*, 402 U.S. 611 (1971) .................................................................12

*Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012)...................................................19

*Cosby v. Ward*, 843 F.2d 967 (7th Cir. 1988) ...............................................................8

*Dean v. Curl*, No. 1:23-cv-00296-REP, 2024 U.S. Dist. LEXIS 94600 (D. Idaho May 28, 2024).....6

*Dupres v. City of Newport*, 978 F. Supp. 429 (D. R.I. 1997).......................................14

*Esco v. City of Chicago* 107 F.4th 673 (7th Cir. 2024) .................................................5

*Gallagher v. O'Connor*, 664 F. App'x 565 (7th Cir. 2016)..........................................10

*Geinosky v. City of Chicago*, 675 F.3d 743 (7th Cir. 2012)........................................5, 6

*Gonzalez v. City of Elgin*, 578 F.3d 526 (7th Cir. 2009)..............................................25

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)................................................12, 15

*Gresham v. Peterson*, 225 F.3d 899 (7th Cir. 2000) ..............................................11, 12

*Hill v. Colorado*, 530 U.S. 703 (2000)........................................................................11

*Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489 (1982) ..........................11

*L.A. County v. Humphries*, 562 U.S. 29 (2010) ................................................................. 8

*Lihosit v. Flam*, No. CV-15-01224-PHX-NVW, 2016 U.S. Dist. LEXIS 64790, 2016 WL 2865870 (D. Ariz. May 17, 2016) ................................................................................................... 6

*Lopez v. Gonzales*, 549 U.S. 47 (2006) ............................................................................. 13

*Magyar v. St. Joseph Regional Medical Center*, 544 F.3d 766 (7th Cir. 2008) ................ 19

*McCullen v. Coakley*, 573 U.S. 464 (2014) ...................................................................... 18

*Michigan v. DeFillippo*, 443 U.S. 31 (1979) ..................................................................... 24

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) ..................................................... 7, 8

*NAACP v. Button*, 371 U.S. 415 (1963) ........................................................................... 12

*Nichols v. Gulfport*, 589 So. 2d 1280 (Miss. 1991) ........................................................ 14

*Petropoulos v. City of Chicago*, 448 F. Supp. 3d 835 (N.D. Ill. 2020) ............................ 10

*Powe v. City of Chicago*, 664 F.2d 639 (7th Cir. 1981) ..................................................... 8

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ............................................................ 16, 25

*Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997) ..................................... 11, 12

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984) .................................................. 12

*Saia v. New York*, 334 U.S. 558 (1948) ....................................................................... 15, 25

*Sanz v. City of Vallejo*, No. 2:19-CV-02134-TLN-DB, 2021 U.S. Dist. LEXIS 122764 (E.D. Cal. June 30, 2021) ............................................................................................................. 6

*Sisters For Life, Inc. v. Louisville-Jefferson Cty.*, 56 F.4th 400 (6th Cir. 2022) ............... 16

*Smith v. Goguen*, 415 U.S. 566 (1974) ............................................................................ 11

*Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006 (7th Cir. 2006) ............................... 25

*Surita v. Hyde*, 665 F.3d 860 (7th Cir. 2011) ................................................................... 25

*Tanner v. City of Va. Beach*, 674 S.E.2d 848 (Va. 2009) ........................................... 13, 15

*Thelen v. State*, 526 S.E.2d 60 (Ga. 2000) ...................................................................... 14

*United States v. Armstrong*, 517 U.S. 456 (1996) ........................................................... 22

*United States v. Williams*, 553 U.S. 285 (2008)..................................................................12

*Walsh v. Kaluzny Brother's Inc.*, No. 14-cv-3412, 2015 U.S. Dist. LEXIS 147812 (N.D. Ill. Oct. 30, 2015) ...........................................................................................................................25, 26

*Williams v. Brooks*, 809 F.3d 936 (7th Cir. 2016) ...............................................................6

*Wolf-Lillie v. Sonquist*, 699 F.2d 864 (7th Cir. 1983). .........................................................9

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ............................................................................16

**Statutes**

775 ILCS 35/15 ....................................................................................................................26

**Other Authorities**

Chicago Ordinance § 8-32-070 ..............................................................................................7

Fed. R. Evid. 201(b)(2) ...........................................................................................................6

Lewis Carroll, *Alice in Wonderland and Through the Looking Glass* 198 (Messner 1982).............13

Plaintiffs Brett Raio, Perez Ndi, and Reetik Dhamala respectfully submit this opposition to Defendants' motion to dismiss Plaintiffs' Amended Complaint.

## STATEMENT OF FACTS

Plaintiffs Brett Raio, Perez Ndi, and Reetik Dhamala are street preachers who engage in religious evangelism in public areas of Chicago. *See* Amended Complaint, Doc. 17 at ¶¶ 12, 14-15. Raio is from Maine and travels the country to evangelize, frequently using amplification and carrying First Amendment case law with him. *Id.* at ¶¶ 12-13. Ndi is a street preacher from Chicago who immigrated from Cameroon and has a religious calling to deliver religious prophecies to the public. *Id.* at ¶ 14. Dhamala is a street preacher from Wheaton, Illinois, who immigrated from Nepal and assists local street preachers as part of his religious practice. *Id.* at ¶ 15.

### The December 10, 2024, Incident and Enforcement Pattern

On December 10, 2024, all three Plaintiffs were engaged in street preaching at the intersection of East Madison Street and North Michigan Street next to Millennium Park in Chicago, using a microphone connected to a battery-powered speaker to amplify their voices. Doc. 17 at ¶¶ 25, 27. The incident began when an individual approached and heckled Plaintiffs, prompting them to move their speaker away in an attempt to appease him. *Id.* at ¶ 28. When the heckling continued, this individual called the police about their conduct. *Id.* at ¶¶ 29-30.

When Chicago Police Officers Jackson and Sutor arrived at approximately 11:15 a.m., they immediately demanded a permit without conducting any sound measurement. Doc. 17 at ¶¶ 31-33. When Raio responded that "there's no permit for the First Amendment," Officer Jackson turned off the speaker, told Plaintiffs they needed a permit, and grabbed the speaker. *Id.* at ¶¶ 34-35. The officers consistently suggested that noise amplification itself was illegal, stating, "You cannot have amplified music out here" and "I'm going to take you to jail because you're playing amplified music." *Id.* at ¶¶ 46, 48.

Significantly, the officers never used a decibel meter to measure sound levels as required by Chicago Municipal Code § 8-32-070, which prohibits amplification "louder than average conversational level at a distance of 100 feet." Doc. 17 at ¶¶ 53-54. Instead, they relied on a citizen complaint claiming use of a "decibel meter app" without any verification. *Id.* at ¶ 53. When Plaintiffs later measured their own sound levels, they found their amplified preaching registered 74 decibels while ambient downtown Chicago noise measured between 71-85 decibels, demonstrating that their sound was actually lower than ambient noise levels. *Id.* at ¶ 52.

Raio was cited under Chicago Municipal Code §§ 8-4-055 (Sound Emitting Devices on Public Conveyances) and 2-84-300(a) (Resisting Police Officer), though no public conveyance was involved. Doc. 17 at ¶ 56. Officers presumably intended to cite him under § 8-32-070 (Music and Amplified Sound). *Id.* When counsel showed Plaintiffs' video of the incident to the prosecuting attorney on February 21, 2025, both charges were promptly dismissed. *Id.* at ¶ 58.

**The February 24, 2025, Incident: Escalation of Enforcement Policy**

The very next business day after Raio's charges were dismissed, February 24, 2025, Officers Joyce, Gatlin, and Petraski arrested Ndi and Dhamala at the same intersection while they were engaged in conduct identical to Raio's. Doc. 17 at ¶¶ 59-61. This timing demonstrates a clear pattern of retaliatory enforcement. The officers immediately yelled at the preachers to turn down their volume and accused them of violating noise ordinances without conducting any sound measurement. *Id.* at ¶¶ 61-62.

When Ndi and Dhamala informed the officers that they had already prevailed in court in Raio's case and had a constitutional right to continue their activities, the officers ignored this information and continued ordering them to stop. Doc. 17 at ¶ 63. When Dhamala asked if the officers had conducted a sound reading, the officer replied, "It's not a requirement," directly contradicting the written ordinance. *Id.* at ¶ 64.

The February 24 incident demonstrated a significant escalation in enforcement severity compared to the December 10 incident: Ndi and Dhamala were held in jail for approximately seven hours, Doc. 17 at ¶ 66, their personal property, including speaker, microphone, and camera stand, was seized and not returned. *Id.* at ¶ 67. Unlike Raio's administrative citation, Ndi and Dhamala were charged criminally and received pretrial release conditions. *Id.* at ¶ 69. That criminal case is ongoing.

### Systematic Policy and Practice

The Complaint alleges that Defendants have adopted "a de facto policy of arresting street preachers, regardless of evidence, simply for sharing the Gospel on the streets of Chicago." Doc. 17 at ¶ 1. This policy constitutes "an egregious violation of constitutional rights, unmoored from any of the actual published ordinances of Chicago." *Id.*

Rather than properly enforcing Chicago Municipal Code § 8-32-070, which only requires permits for amplification "louder than an average conversational level at a distance of a hundred feet," Defendants are willing to cite and arrest those people who use amplification without a permit. Doc. 17 at ¶¶ 2-3. Moreover, they target those spreading religious and pro-life speech for this enforcement. *Id.* ¶ 91. This enforcement pattern directly contradicts the written law, which does not require permits for all amplification. *Id.*

Defendants' actions suggest that they are engaging in "a targeted practice of enforcing their interpretation of the noise ordinance against only religious speakers." *Id.* The unwritten policy constitutes "a pattern or practice of unconstitutional conduct that is certain to continue absent any relief." *Id.* at ¶ 82. This selective enforcement demonstrates viewpoint discrimination, as the government cannot "regulate speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* at ¶ 94.

The officers' conduct "was tolerated by the practices, customs, and policies of the City of Chicago, which did nothing to correct or stop this conduct but has allowed the conduct to continue."

Doc. 17 at ¶ 71. The policies and practices that led to these constitutional violations "remain in full force and effect," demonstrating "deliberate indifference to the ongoing violation of Plaintiffs' First Amendment rights." *Id.* at ¶¶ 72-73.

Plaintiffs continue to suffer irreparable harm because "their speech has been chilled out of concern they will be arrested again if they were to use amplification to speak in public anywhere in Chicago, even though they are rightfully entitled to do so under the Constitution." *Id.* at ¶ 103. The acts of Defendants "would chill a reasonable person from continuing to engage in the constitutionally protected activity of Plaintiffs." *Id.* at ¶ 104.

**STANDARD OF REVIEW**

At the motion to dismiss stage, the Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of Plaintiffs. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court's inquiry is limited to "the four corners of" the complaint and must determine whether it contains "sufficient factual matter" to state a claim that is "plausible on its face." *Id.* at 674, 678.

**ARGUMENT**

Defendants ask this Court to resolve disputed facts, ignore established pleading standards, and excuse systematic constitutional violations, all while relying on body camera footage never disclosed to Plaintiffs. This transparent attempt to short-circuit the litigation process fails on every level and should be rejected.

I.      **Defendants Cannot Rely on Material Not Before This Court.**

A. **Video Footage Upon Which Defendants' Rely Is Not Referenced in the Complaint.**

Defendants seek to have this Court resolve disputed factual questions based on body camera footage that was never disclosed to Plaintiffs or incorporated into their complaint. Defendants' offering up and characterization of extraneous video not even referenced in the complaint violates the

fundamental principle that, on a Rule 12 motion to dismiss, the Court must accept Plaintiffs' version of the facts as true. Moreover, it denies Plaintiffs their right to discovery, expert analysis, and jury determination of contested facts. By relying extensively on their own characterizations of this footage, Defendants violate the well-established standards that govern a motion to dismiss.

This Court cannot go beyond the four corners of the complaint at this stage. It is true that "the incorporation-by-reference doctrine provides that if a plaintiff mentions a document in his complaint, the defendant may then submit the document to the court without converting defendant's 12(b)(6) motion to a motion for summary judgment." *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). However, "[a] motion under Rule 12(b)(6) can be based only on the complaint itself, documents attached to the complaint, documents that are ***critical*** to the complaint ***and referred to in it***, and information that is subject to proper judicial notice." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (emphasis added).

Defendants argue "[t]he body camera footage shows the same events Plaintiffs recorded. The Court can also infer that the Amended Complaint relies on video footage: it includes lengthy quotations and detailed descriptions of the parties' actions, and exact times of day and lengths of time[.]" Defs. Mem. in Support of Motion to Dismiss, Doc. 40 at 10 (citations omitted). Body camera footage, whether this footage or any other, is never so much as mentioned in the complaint or in any other way incorporated therein. Defendants' argument would eviscerate the incorporation requirement. Under their logic, any sufficiently detailed complaint would automatically incorporate all video footage of the relevant events, even footage unknown to the plaintiff.[1] Such reasoning would render meaningless the Seventh Circuit's clear limitation as articulated in *Geinosky* on what materials

---

[1] Defendants' reliance, Doc. 40 at 10, on *Esco v. City of Chicago* is inapposite, as Plaintiff in that case had conceded the trial court's consideration of body-worn camera was appropriate at the motion to dismiss stage, since Plaintiff "referenced it in his complaint" and it was "dispositive of the issue of probable cause." 107 F.4th 673, 678 (7th Cir. 2024) (citing Plaintiff's Br.).

may be considered at the Rule 12(b)(6) stage and would dissolve any meaningful distinction between a Rule 12 motion to dismiss and a Rule 56 motion for summary judgment. 675 F.3d at n.1. By referencing *Plaintiffs'* video, Plaintiffs did not thereby incorporate *Defendants'* video.

### B. The Body Camera Footage Does Not "Blatantly Contradict" Plaintiffs' Allegations and is Not Subject to Judicial Notice.

There are no grounds for this Court to take judicial notice of body camera footage here. Courts take judicial notice of facts that are "not subject to reasonable dispute" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Judicial notice of video evidence is appropriate only where the footage "blatantly contradict[s]" a plaintiff's allegations. *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016). This is because "any photograph or film shows only one perspective on a scene, so that additional perspectives, such as eyewitness testimony or photographs or films from different angles or different times, might reveal additional facts that would change the legal analysis." *Bogie v. Rosenberg*, 705 F.3d 603, 611 (7th Cir. 2013). As the proponent of the evidence, Defendants bear the burden of showing the video's admissibility. Multiple federal courts have declined to take judicial notice of body camera footage where its contents are disputed or subject to interpretation.[2]

Even if body camera footage could be considered, Defendants have failed to demonstrate the requisite "blatant contradiction" required under *Williams v. Brooks*. Instead of identifying specific

---

[2] *See, e.g., Dean v. Curl*, No. 1:23-cv-00296-REP, 2024 U.S. Dist. LEXIS 94600, at *7 (D. Idaho May 28, 2024) ("[T]he Court can judicially notice the existence of the body camera footage but—because it is unclear at this point whether the events depicted in that footage are disputed—may not consider the video as substantive evidence at this stage"); *Sanz v. City of Vallejo*, No. 2:19-CV-02134-TLN-DB, 2021 U.S. Dist. LEXIS 122764, at *3 (E.D. Cal. June 30, 2021) ("[W]hile the body camera footage may be considered public record appropriate for judicial notice, the substance of the video is subject to varying interpretations.... [T]aking judicial notice of the contents of the video at this stage would be inappropriate."); *Brown v. City of San Diego*, No. 3:17-CV-00600-H-WVG, 2017 U.S. Dist. LEXIS 146888, at *2 (S.D. Cal. Sept. 11, 2017) (finding that a factual dispute as to what was shown on police body-worn camera video precluded it from being considered on a Rule 12(c) motion); *Lihosit v. Flam*, No. CV-15-01224-PHX-NVW, 2016 U.S. Dist. LEXIS 64790 at *4 (D. Ariz. May 17, 2016) (considering police body-worn camera "only to the extent that it [was] unambiguous and not subject to multiple inferences").

material factual disputes, Defendants make legal characterizations and interpretations. For example, Defendants assert that footage shows "the amplifier's volume was above normal conversational level." Doc. 40 at 10. This is not a "blatant contradiction" but a legal conclusion requiring factual analysis about decibel levels, distance measurements, and ambient noise—precisely the type of disputed factual determination inappropriate at the Rule 12(b)(6) stage.

### C. Defendants' Own Characterizations of the Footage Support Plaintiffs' Claims.

Even if this Court were to consider Defendants' proffered evidence and characterizations thereof, it does nothing to weaken the validity of Plaintiffs' Amended Complaint. For instance, Defendants acknowledge that an officer told Plaintiff Raio he lacked a First Amendment right to amplification—a statement directly contrary to established Supreme Court precedent and supporting Plaintiffs' allegations of constitutional violations. Defendants point to a statement of an officer to Plaintiffs that "I could hear you over a block and a half away." Doc. 40 at 8. In contrast, Chicago Ordinance § 8-32-070 prohibits sound that is "louder than average conversational level at a distance of 100 feet or more, measured vertically or horizontally, from the source." Defendants allege that "[a]s the officers parked adjacent to Plaintiffs' location, Plaintiffs' amplifier was audible through the officers' closed car window at well above a normal conversational level." Doc. 40 at 4. The legal standard requires measurement at 100 feet, not an adjacent parking space. These examples clearly demonstrate the impropriety and problems with considering Defendants' footage at this stage.

## II. The *Monell* Doctrine Provides No Obstacle to Plaintiffs' Claims (Counts I-IV, VI-VII).

Defendants erroneously argue that Plaintiffs have failed to allege an unconstitutional municipal policy under *Monell v. Department of Social Services*, but their argument rests on a fundamental mischaracterization of both the legal standard and the factual allegations. 436 U.S. 658 (1978). The persistent pattern of selective enforcement alleged here, supported by concurrent

litigation and occurring with systematic regularity, establishes the type of governmental custom that warrants municipal liability under § 1983.

The *Monell* "policy or custom" requirement does not arbitrarily limit liability only to formally propagated policies; it is instead designed merely to ensure that a municipality is "held liable under § 1983 only for its own violations of federal law." *L.A. County v. Humphries*, 562 U.S. 29, 36 (2010). Liability can be imposed on a municipality for its "policy or custom," that is, for "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," for "deprivations visited pursuant to governmental 'custom **even though such a custom has not received formal approval**," and for a municipality's "usage" and "practice." *Id.* at 36 (quoting *Monell*, 436 U.S. at 690-91 (emphasis added)).

The Supreme Court observed that Congress included "customs and usages" in § 1983 because state officials engaged in persistent and widespread discriminatory practices that, although not authorized by written law, "could well be so permanent and well-settled as to constitute a 'custom or usage' with the force of law." *Monell*, 436 U.S. at 691 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)). Under Seventh Circuit precedent, municipal liability can be established through repeated instances of constitutional violations. *Powe v. City of Chicago*, 664 F.2d 639, 650 (7th Cir. 1981) (holding that "where the plaintiff alleges a pattern or a series of incidents of unconstitutional conduct, then the courts have found an allegation of policy sufficient to withstand a dismissal motion"). Plaintiffs, arrested in separate incidents, allege just such a pattern, a series of unconstitutional arrests. *See also Cosby v. Ward*, 843 F.2d 967, 983 (7th Cir. 1988). Under *Powe*, those allegations of a pattern of conduct satisfy the *Monell* standard of establishing a custom or policy.

Plaintiffs do not allege that the City of Chicago has adopted a *written policy* to target street preachers, but rather, that it has *a custom or practice* of enforcing Chicago Ordinance § 8-32-070 based on speakers' viewpoints. The facts alleged in the complaint sufficiently allege this custom of

unequal enforcement and discrimination. "Informal actions, if they reflect a general policy, custom, or pattern of official conduct which even tacitly encourages conduct depriving citizens of their constitutionally protected rights, may well satisfy the amorphous standards of § 1983." *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 870 (7th Cir. 1983).

Moreover, the complaint alleges more than an isolated incident. It describes two arrests, occurring within months of each other and involving the same type of religious activity at the same location, showing a broader pattern of selective enforcement and practice that transcends any individual officer's actions. Taken together, these reflect systematic municipal conduct warranting relief under § 1983.

The enforcement pattern detailed in Plaintiffs' complaint is further evidenced by the concurrent litigation in *Acevedo v. Zatora et al*, No. 1:24-cv-12654 (N.D. Ill., filed Dec. 9, 2024). In *Acevedo*, the City of Chicago conceded that "Plaintiffs in both cases contend that the City misapplied the sound amplification ordinance to their use of an amplifier on the public way." Defendants' Response to Plaintiffs' Notice of Related Case, *Acevedo v. Zatora et al*, No. 1:24-cv-12654 (N.D. Ill., April 7, 2025), Dkt. No. 54 at ¶ 3. *Acevedo* alone demonstrates that this case involves more than two arrests.

The standard at the motion to dismiss stage requires only adequate pleading of a plausible claim, not complete proof. Discovery will necessarily uncover and allow comparison of other instances of enforcement, revealing the full scope of Defendants' discriminatory practice. Plaintiffs cannot be expected to have exact knowledge of the City's enforcement practices against other parties prior to litigation, and Defendants cannot argue that evidence of such information is required to be in the complaint. Regardless, even at this stage, Defendants' claim that officers "had ample evidence of Ordinance violations," Doc. 40 at 12, is belied by their own assertions. Regarding Raio's arrest, Defendants concede that officers reacted in response to a noise complaint without any independent

attempt to confirm the volume level. The officers relied on hearsay complaints rather than objective verification of any violation. While officers made some effort to listen during Ndi and Dhamala's arrest, they still failed to quantify or measure sound levels in a manner that would satisfy legal standards for enforcement.

Defendants cite three cases in their argument against the existence of an unconstitutional policy: *Petropoulos v. City of Chicago*, 448 F. Supp. 3d 835 (N.D. Ill. 2020); *Calusinski v. Kruger*, 24 F.3d 931 (7th Cir. 1994); and *Gallagher v. O'Connor*, 664 F. App'x 565 (7th Cir. 2016). However, all these cases concerned allegations based on a *single instance* of misconduct, making them readily distinguishable from the pattern alleged here. *See Petropoulos*, 448 F. Supp. 3d at 841 ("The Petropouloses argue that allegations based on their own experience — a single instance of misdirected mail — is enough to allege a policy."); *Calusinski*, 24 F.3d at 936 (*Monell* "requires more than a single incident of unconstitutional conduct."); *Gallagher*, 664 F. App'x at 569 ("[H]is complaint merely describes the factual circumstances of his arrest and tacks on boilerplate allegations that trace the legal requirements of a *Monell* claim.").

Thus, the *Monell* doctrine presents no obstacle to Plaintiffs' claims, which adequately allege municipal liability under § 1983 based on an unconstitutional custom or practice of selective enforcement. The pattern alleged here extends far beyond the actions of individual officers and reflects systematic municipal conduct. The consistent enforcement at the same location, the identical misapplication of the Ordinance requirements (failing to conduct proper sound measurements), and the escalating severity of enforcement demonstrate a coordinated policy rather than isolated misconduct. Most significantly, the concurrent litigation in *Acevedo v. Zatora* establishes that this enforcement pattern is not limited to Plaintiffs' experiences.

### III. Plaintiffs' Facial Challenge to Chicago Ordinance § 8-32-070 Should Proceed (Counts III and VIII).

Chicago Ordinance § 8-32-070 suffers from the constitutional infirmity of vagueness, failing both prongs of the established test that requires (1) fair notice to citizens, and (2) adequate guidance to prevent arbitrary enforcement. The Ordinance's reliance on entirely subjective standards creates precisely the kind of standardless delegation of authority that the Supreme Court has repeatedly condemned, particularly in the context of laws affecting First Amendment rights.

#### A. The Void-for-Vagueness Doctrine Applies Heightened Scrutiny to Laws Affecting First Amendment Rights.

"Vague rules are overbroad because their scope is uncertain and . . . they tend to produce large chilling effects." *Brown v. Kemp*, 86 F.4th 745, 771 (7th Cir. 2023); *see also Reno v. American Civil Liberties Union*, 521 U.S. 844, 871–72 (1997). The mechanisms by which vague rules cause chilling effects are two-fold. A statute can be impermissibly vague where it either (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

A vague regulation of expression "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno*, 521 U.S. at 871–72. In fact, the Supreme Court has regularly warned against vagueness as a particular danger to First Amendment rights. *Smith v. Goguen*, 415 U.S. 566, 573 (1974) ("Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts."); *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 499 (1982) (If "the law interferes with the right of free speech of or association, a more stringent vagueness test should apply.").

The First Amendment prohibits vague laws that infringe on the right to speak. *Gresham v.*

*Peterson*, 225 F.3d 899, 907 (7th Cir. 2000) (The void-for-vagueness doctrine forbids the enforcement of a law that contains "terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application.") (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 629 (1984)); *NAACP v. Button*, 371 U.S. 415, 433 (1963) ("Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.").

> The Supreme Court has reasoned:
>
> What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is. Thus, we have struck down statutes that tied criminal culpability to whether the defendant's conduct was "annoying" or "indecent"—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings.

*United States v. Williams*, 553 U.S. 285, 306 (2008) (citing *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971), and *Reno*, 521 U.S. at 870–71 & n.35). The law "must give people fair notice of what conduct is prohibited so that they may conduct themselves within the law's bounds." *Brown*, 86 F.4th at 772. "[W]here a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.'" *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972).

### B. Chicago Ordinance § 8-32-070 Fails to Provide Fair Notice Through Objective Standards.

One crucial way in which vagueness is demonstrated is "the indeterminacy of what conduct constitutes a violation." *Brown*, 86 F.4th at 772; *United States v. Williams*, 553 U.S. 285, 306 (2008) ("What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is."). In *Coates v. City of Cincinnati,* 402 U.S. 611 (1971), the Supreme Court struck down a city ordinance that made it a criminal offense for three or more individuals to assemble on

public sidewalks and conduct themselves in a manner that might *annoy* passersby.

> Conduct that annoys some people does not annoy others. Thus, the ordinance is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.

*Id.* at 614. That is precisely the problem here.

Chicago Ordinance § 8-32-070's standard of "louder than average conversational level at a distance of 100 feet" provides no meaningful guidance for enforcement. The term "average conversational level" is inherently subjective and provides no objective standard for officers to apply. The definition referring to "a level at which normal, unamplified speech is clearly and distinctly audible above ambient noise level," *id.* § 8-32-02, merely compounds the vagueness by introducing additional subjective terms, such as "normal" speech. The lack of specific decibel measurements or other objective standards renders the Ordinance unconstitutionally vague as applied to protected speech. Instead of prohibiting sounds with specificity, the text of the Ordinance provides no objective criteria by which an ordinary person can determine whether their conduct violates the law, as "average conversational level" is an entirely subjective standard that varies based on numerous factors, including ambient noise, weather conditions, and individual perception.[3] *See Tanner v. City of Va. Beach*, 674 S.E.2d 848, 853 (Va. 2009) (holding that ordinance prohibiting "unreasonably loud, disturbing and unnecessary noise," noise of "such character, intensity and duration as to be detrimental to the life or health of persons of reasonable sensitivity," failed to give "fair notice" to citizens as required by the Due Process Clause, because the provisions do not contain ascertainable standards.).

"Noise that one person may consider 'loud, disturbing and unnecessary' may not disturb the

---

[3] As Lewis Carroll observed through Humpty Dumpty, who "used a word to mean 'just what [he chose] it to mean—neither more nor less,'" Chicago's Ordinance transforms legal standards into exercises of arbitrary interpretation where the meaning of words is unknowable. *Lopez v. Gonzales*, 549 U.S. 47, 54 (2006) (quoting Lewis Carroll, *Alice in Wonderland and Through the Looking Glass* 198 (Messner 1982)).

sensibilities of another listener. As employed in this context, such adjectives are inherently vague because they require persons of average intelligence to guess at the meaning of those words." *Id.*; *see also Nichols v. Gulfport*, 589 So. 2d 1280, 1283 (Miss. 1991) ("The adjectives 'unnecessary' and 'unusual' modifying the noun 'noises' are inherently vague and elastic and require men of common intelligence to guess at their meaning."); *Thelen v. State*, 526 S.E.2d 60, 62 (Ga. 2000) (holding that by prohibiting "any … unnecessary or unusual sound or noise which … annoys … others," an ordinance failed "to provide the requisite clear notice and sufficiently definite warning of the conduct that is prohibited.").

### C. The Ordinance's Subjective Standards Invite Arbitrary and Discriminatory Enforcement.

Effective noise ordinances must provide objective measurement criteria, including specific decibel limits for different zones and times, standardized measurement procedures, consideration of ambient noise levels, and other crucial objective indicia. Chicago Ordinance § 8-32-070 contains none of these essential elements. The "average conversational level" standard is scientifically meaningless and impossible to enforce consistently, as conversational levels vary dramatically based on individual vocal characteristics, environmental conditions, and subjective perception. The Ordinance provides no guidance on how this standard should be measured or any objective, defined guidance. In contrast, a decibel-based ordinance would define "the conduct it proscribes with the requisite specificity so as to pass constitutional muster." *Dupres v. City of Newport*, 978 F. Supp. 429, 433 (D. R.I. 1997). Such an ordinance would establish "specific, objective, and measurable limits on sound for the various parts of the city." *Id.* While the Ordinance does define a specific location for measurement, the measurement itself is left as vague as "average conversational level," leaving listeners uncertain of the Ordinance's meaning. The City itself fluctuates in its justification, describing the Ordinance at one point as concerning an "amplifier that can be heard from 100 feet away" Doc. 40 at 17, even though that is not the Ordinance's actual definition.

Music and sound regulations that vest officials with discretionary authority to determine what sounds are "acceptable" create the risk of content-based censorship. The Ordinance's vague "average conversational level" standard necessarily requires enforcement officials to make subjective judgments about the appropriateness of particular sounds, music, or speech, creating an impermissible risk of content-based discrimination. A vague law invites such disparate treatment by impermissibly delegating policy considerations "to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned*, 408 U.S. at 108-09. Chicago Ordinance § 8-32-070 does that very thing, and it leaves "to a police officer the determination whether persons the police officer considers to be reasonable would be disturbed or annoyed in their comfort or repose by the particular noise at issue." *Tanner*, 674 S.E.2d at 853. Such discretion is constitutionally troublesome because "Police officers likely will have differing perceptions regarding what levels of sound exceed the described tolerance levels and sensitivities of reasonable persons." *Id.*

### D. The Ordinance's Vagueness Chills Protected Speech by Restricting Access to Amplification.

Defendants claim that speech is not chilled by being able to speak to the public without amplification. But the medium is the message. Since at least 1948, the Supreme Court has recognized that "[l]oud-speakers are today indispensable instruments of effective public speech." *Saia v. New York*, 334 U.S. 558, 561 (1948). In *Saia*, the Court encouraged "narrowly drawn statutes" to deal with "[a]ny abuses which loud-speakers create." *Id.* at 562. By prohibiting Plaintiffs' amplification, Defendants have chilled Plaintiffs' exercise of their speech.

### IV.   Plaintiffs Adequately Allege an As-Applied Violation of their Free Speech rights (Counts I and VII).

Defendants fundamentally mischaracterize Plaintiffs' constitutional challenge by focusing on the facial neutrality of Chicago's noise ordinance. The constitutional violations here, however, stem

from Defendants' discriminatory *application* of that ordinance to suppress disfavored religious viewpoints.

### A. Defendants' Selective Enforcement Constitutes Content-Based Discrimination.

Defendants' reliance on case law regarding content-neutral time, place, and manner restrictions entirely misses the mark. Plaintiffs bring a targeted as-applied challenge, alleging that Defendants have systematically applied this facially neutral ordinance in a content-based and viewpoint-discriminatory manner to suppress religious speech while ignoring similar or louder secular activities. When government actors apply facially neutral laws in a discriminatory fashion, the constitutional analysis fundamentally changes. "[G]overnment regulation of expressive activity is content based if it applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). *See also Sisters For Life, Inc. v. Louisville-Jefferson Cty.*, 56 F.4th 400, 404 (6th Cir. 2022) ("a regulation may be content based by its nature, or may become so when applied with 'an unequal hand.'") (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886)).

Specifically, Plaintiffs allege that "[i]t is the unwritten policy and practice of Chicago police to cite all street preachers, regardless of whether they meet the requirements of Chi., Ill., Code § 8-32-070 and regardless of the evidence." Doc. 17 at ¶ 87. Plaintiffs used amplification at volumes comparable with typical downtown Chicago ambient noise levels, including street performances, political demonstrations, and commercial advertising. Those secular speakers were ignored. Officers never measured sound levels at a distance of 100 feet as required by Chicago Municipal Code § 8-32-070, instead relying on subjective impressions and unverified citizen complaints. Doc. 17 at ¶¶ 53, 90. When Plaintiffs themselves measured their amplification levels after the December incident, they found their preaching registered "74db" while "ambient noise of noisy downtown Chicago was between 71-85db," demonstrating their sound was lower than ambient noise levels. *Id.* ¶ at 52. This

shows a pattern of targeting Plaintiffs' religious speech while ignoring comparable or louder speech of secular speakers.

None of the new body camera footage changes this unjustified enforcement. The core of Plaintiffs' complaint is that in both circumstances where they were arrested, the police themselves did not conduct the required measurement at a specific distance of 100 feet. *See* Doc. 17 at ¶ 90. Instead, officers relied on subjective complaints and targeted enforcement based on the religious content of the speech. The discriminatory enforcement is demonstrated by officers' immediate focus on permits rather than sound levels. Upon arrival, Officer Jackson ordered Plaintiffs to lower the sound and demanded a permit without conducting any sound measurement or investigation into actual ordinance compliance. Doc. 17 at ¶ 33. When Raio attempted to explain constitutional protections, officers ignored legal argument and focused solely on permit requirements that do not exist in the ordinance for sound below specified thresholds.

The content-based nature of this enforcement is also evidenced by the officers' explicit statements about the religious activity. Officers repeatedly stated "You cannot have amplified music out here" and "I'm going to take you to jail because you're playing amplified music," treating amplification itself as inherently unlawful rather than evaluating whether the specific sound levels violated the ordinance's standards. Doc. 17 at ¶¶ 46, 48. This permit-focused enforcement reveals that officers were not genuinely concerned with noise levels but were seeking any pretext to suppress the religious speech of the Plaintiffs, while ignoring comparable or louder secular speech.

The role of the complaining citizen further demonstrates the content-based nature of this enforcement. The individual who called the police had specifically targeted Plaintiffs' religious message, not their volume, telling them: "Every time you're out here I'm going to call the police, I'm just letting you know. I'm going to keep calling and we'll play this game all fucking summer. Get a life." Doc. 17 at ¶ 50. This explicit threat to repeatedly call police based on disagreement with

Plaintiffs' religious message, not their sound levels, combined with the officers' immediate response without investigation, demonstrates that the enforcement was driven by hostility to the religious content rather than legitimate noise concerns.

The systematic nature of content-based enforcement is further revealed by the consistency of the officers' responses across different incidents. In both December and February, officers immediately demanded permits and treated amplification as categorically illegal, with Officer Jackson stating, "You cannot have amplified music out here," and, in February, officers immediately yelled at Plaintiffs to "turn down the volume" without investigation. Doc. 17 at ¶¶ 46, 61. This consistent response pattern, focused on suppressing amplified religious speech regardless of actual sound levels, demonstrates an institutional practice of content-based discrimination.

Accordingly, Plaintiffs have adequately alleged that Defendants discriminated against them based on viewpoint, targeting their religious viewpoints for suppression, which is unjustified by the text of the Ordinance. They were targeted because of a complaint about their message, even though they were not as loud as the other speakers nearby as part of the ambient noise of the City. This allegation goes to the heart of viewpoint discrimination—enforcement based on the religious nature of the speech rather than objective violation of neutral criteria.

Defendants' justifications for a content-neutral ordinance, where Plaintiffs allege that the Ordinance has been applied in a viewpoint-discriminatory manner, are entirely irrelevant. The Ordinance itself may be neutral on its face, but Defendants' custom of unequal enforcement targeted toward religious expression renders it content based. *See McCullen v. Coakley*, 573 U.S. 464, 484–85 (2014) (a facially content-neutral ordinance can become content-based if enforced selectively). As discussed above, Plaintiffs themselves have experienced multiple separate instances of such unequal enforcement. The constitutional infirmity lies in Defendants' selective and pretextual application of the Ordinance to suppress disfavored religious speech.

## B. Plaintiffs Have Adequately Alleged Retaliation.

Plaintiffs have adequately alleged retaliation in violation of their First Amendment rights based on an "evidentiary mosaic" that creates a compelling inference of retaliatory motive. *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012). The extraordinary timing here provides powerful circumstantial evidence of retaliation. Defendants arrested Plaintiffs Ndi and Dhamala *the very next business day* after the case against Raio was successfully dismissed. Doc. 17 at ¶ 59. "[S]uspicious timing . . . can sometimes raise an inference of a causal connection." *Magyar v. St. Joseph Regional Medical Center*, 544 F.3d 766, 772 (7th Cir. 2008). "Temporal proximity between protected activity and an adverse [action] can by itself constitute sufficient circumstantial evidence of retaliation in some cases." *Bell v. Clackamas County*, 341 F.3d 858, 865 (9th Cir. 2003).

Beyond the next-day timing, Plaintiffs can demonstrate several additional factors that reinforce the inference of retaliation. Ndi and Dhamala were preaching at the same intersection where they had preached before, Doc. 17 at ¶ 60, and expressly relied on Raio's recent court victory in doing so. *Id.* at ¶ 63. When Plaintiffs asked whether officers had measured sound volume as required by law, officers stated that it is not a requirement, revealing their refusal to follow proper procedures. Doc. 17 at ¶ 64. Plaintiffs can show that their religious speech was the motivating factor in the officers' decision to enforce the Ordinance, and that similar noise violations by non-religious speakers are not subject to the same aggressive enforcement. This "evidentiary mosaic" of next-day timing, same location, explicit reliance on constitutional rights, and officers' refusal to follow legal requirements creates a compelling inference of retaliatory motive that easily survives a motion to dismiss. For these reasons, Plaintiffs have adequately alleged both viewpoint discrimination and retaliation in violation of the First Amendment.

While *Nieves v. Bartlett* held that probable cause "should generally defeat a retaliatory arrest claim," 587 U.S. 391, 405 (2019), the Supreme Court recognized important limitations that apply

here. First, the existence of probable cause under the Ordinance remains disputed. The Ordinance contains ambiguous language regarding what constitutes "audible beyond" the specified distance, and the body camera footage shows religious speech at reasonable volumes that may not have violated the Ordinance when properly interpreted. Probable cause is a fact question that Defendants have failed to conclusively establish. Second, *Nieves* expressly recognized a "narrow qualification" where a plaintiff can succeed regardless of probable cause if they can show they "were arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* at 407. Defendants' argument that this exception doesn't apply misunderstands the burden. The *Nieves* exception focuses on whether individuals engaged in the same conduct but without the protected speech are treated differently, not whether others "routinely avoid arrest" for identical violations. Here, Plaintiffs can demonstrate that the timing and manner of enforcement show differential treatment based on the content of their religious message.

This evidentiary mosaic of next-day timing, same location, explicit reliance on constitutional rights, the officers' refusal to follow legal requirements, and differential treatment based on speech content creates a compelling inference of retaliatory motive that easily survives a motion to dismiss. Plaintiffs have adequately alleged retaliation in violation of the First Amendment.

**V.**      **Plaintiffs Adequately Allege an As-Applied Violation of their Free Exercise rights (Count II).**

Defendants respond to Plaintiffs' free exercise claim as if they allege that the Ordinance is on its face targeted towards religious expression. Plaintiffs make no such assertion. Rather, the crux of Plaintiffs' free exercise claim is Defendants' unwritten policy and custom of targeting religious activity. It is that unwritten custom and policy that targets and infringes upon Plaintiffs' religious rights. As discussed above and incorporated herein by reference, Defendants wield the Ordinance against Plaintiffs' religious beliefs and expression. Plaintiffs were confronted and arrested for religious speech amplified at levels that were lower than ambient noise according to a decibel meter,

while secular speakers could speak and create that amplified noise in downtown Chicago without facing similar enforcement. Doc. 17 at ¶ 52. The heckler's explicit threat—"Every time you're out here I'm going to call the police"—followed by immediate police response without investigation, reveals a system designed to suppress religious viewpoints based on community hostility rather than legitimate regulatory concerns. *Id.* ¶ 50.

Defendants suggest in the alternative that Plaintiffs' religious practice was not substantially burdened by this limitation on their ability to evangelize their faith. They argue, in other words, that Plaintiffs' punishment and arrest for street preaching (and charges that are still pending against them) do not substantially burden their religious rights. In contrast, in *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724-25 (2014), the Supreme Court emphasized that "federal courts have no business addressing" whether particular beliefs are "mistaken or insubstantial" and that courts should not "presume to determine . . . the plausibility of a religious claim." Street preaching is not merely "expressing a message" as Defendants characterize it. It is a fundamental form of religious exercise with deep historical roots in Christianity. Courts cannot parse religious practices into "essential" and "non-essential" components without impermissibly entangling themselves in theological determinations. Plaintiffs have adequately pleaded that amplification is integral to their religious practice of street preaching. The Amended Complaint alleges that "[w]ithout amplification, they would need to raise their voice to be understood by passersby, which would distort the tone of their message." Doc. 17 at ¶ 125. This is not a mere preference for convenience—it directly relates to the theological content and effectiveness of their religious communication. Plaintiffs face arrest and criminal prosecution for engaging in their religious practice. This is the most direct form of burden possible, where the government is literally criminalizing their religious exercise. The practical effect of the enforcement is to prohibit Plaintiffs from engaging in their religious practice in the manner they believe their faith requires.

Plaintiffs have adequately pleaded that amplified preaching is central to their religious practice. The Amended Complaint alleges that Plaintiffs are "street preachers" who regularly engage in this specific form of religious exercise. Doc. 17 at ¶¶ 12-15. They have made amplified preaching a regular part of their religious practice and believe it is necessary for effective religious communication. Courts should not require plaintiffs to provide theological treatises explaining why their specific practices are "mandated" by their religion.

**VI.    Plaintiffs Adequately Allege an Equal Protection Claim (Count IV).**

Plaintiffs' equal protection claim rests on Defendants' systematic targeting of religious speakers while permitting similar or louder secular activities to proceed without enforcement. The Amended Complaint alleges that "it is the unwritten policy and practice of Chicago police to cite all street preachers, regardless of whether they meet the requirements of Chi., Ill., Code § 8-32-070." Doc. 17 at ¶ 87. This creates a classification based on the religious content of speech. The Supreme Court's requirement of a "credible showing of different treatment of similarly situated persons," *United States v. Armstrong*, 517 U.S. 456, 470 (1996), does not demand the impossible standard Defendants suggest. The Amended Complaint alleges that enforcement actions consistently target religious speakers uniquely. As discussed above and incorporated herein by reference, the factual allegations establish that enforcement is triggered not by objective volume standards but by the religious content of Plaintiffs' speech. Here, the immediate police response to religious speech, combined with the apparent tolerance for secular amplified activities in the same area of even higher decibel levels, satisfies this standard. The heckler's explicit targeting of the religious message— "Every time you're out here I'm going to call the police," Doc. 17 at ¶ 50—followed by immediate police response without investigation, demonstrates enforcement triggered by the protected religious speech rather than neutral application of the noise ordinance.

The differential treatment of similarly situated speakers is evidenced by the immediate enforcement response to religious speech compared to the routine tolerance of secular amplified activities. While Plaintiffs faced immediate police intervention for amplified religious speech at volumes lower than ambient noise levels, secular speakers use amplification in the same downtown Chicago areas without similar police response. The speed and intensity of the Ordinance's enforcement against Plaintiffs—with officers arriving within minutes of a complaint and immediately demanding permits—contrasts sharply with the apparent tolerance for secular amplified activities that routinely occur in downtown Chicago.

Defendants' citation to body camera footage showing officers mentioning "volume" proves nothing about the underlying selective enforcement claim. *Contra* Doc. 40 at 22. The issue is not what officers said at the moment of arrest, but rather the pattern of enforcement decisions that brought officers to that moment. As discussed above, Plaintiffs have alleged retaliation that targeted them for their religious activity. The temporal proximity between the dismissal of charges against Raio and the arrest of Ndi and Dhamala creates an overwhelming inference of retaliatory timing. This next-day timing, combined with the escalated response—criminal charges rather than administrative citations, extended detention, and property seizure—demonstrates that Defendants targeted Plaintiffs for their religious activity, unjustified by the text of the Ordinance.

The selective enforcement pattern demonstrates disparate treatment of similarly situated individuals. The equal protection violation is in Defendants' systematic, unequal application of the Ordinance against religious speakers. Discovery will reveal the full scope of this disparate treatment, including instances where secular speakers engaged in identical conduct without facing enforcement. At the pleading stage, Plaintiffs need only allege sufficient facts to support the inference of discriminatory treatment, which they have done by alleging a consistent pattern of targeting religious speech that ignores comparable secular activities.

VII.   **Plaintiffs Adequately Allege a Fourth Amendment False Arrest Claim (Count VII).**

Probable cause requires "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). Critically, this standard demands objective evidence known to the arresting officers at the time of arrest—not post-hoc rationalizations or disputed factual assertions made in litigation. The burden of establishing probable cause rests squarely on Defendants. When Plaintiffs challenge the existence of probable cause, Defendants must demonstrate that the undisputed facts support their officers' reasonable belief that a violation occurred. They cannot meet this burden through conclusory assertions or by asking the Court to resolve disputed factual questions in their favor.

Defendants assert that the officers possessed sufficient evidence that Plaintiffs' amplifiers violated Chicago's sound ordinance by being "audible above average conversational level from 100 feet away." Doc. 40 at 23. This assertion demonstrates precisely why summary resolution at the very start of this case is inappropriate. Defendants are asking the Court to accept as true highly contested factual claims that go to the heart of the probable cause analysis.

The absence of objective justification for arrest is demonstrated by the Defendants' failure to follow the basic investigative procedures required by the Ordinance they claimed to enforce. Despite the Ordinance requiring measurement at a distance of 100 feet, officers made no attempt to conduct such measurements, instead relying on unverified citizen complaints and their own subjective impressions. Doc. 17 at ¶¶ 53, 90. When Plaintiffs later conducted proper measurements, they found their amplification registered "74db" while ambient downtown noise measured "between 71-85db," proving their sound was actually quieter than the surrounding environment. *Id.* ¶ 52. No reasonable officer could conclude that sound levels lower than ambient noise violated the Ordinance.

But regardless, factual disputes underlying probable cause cannot be resolved on a motion to dismiss. In fact, this very point is made in the case relied upon by Defendants, *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009). Shortly after the language Defendants cite, the Seventh Circuit emphasized, "[t]he jury must determine the existence of probable cause 'if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them.'" *Id.* (*quoting Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1013-14 (7th Cir. 2006)). As the court expressly stated: "[o]nly if the underlying facts claimed to support probable cause are not in dispute may the court decide whether probable cause exists." *Id.* That is precisely the problem here; the factual allegations made by Defendants to try to support probable cause are very much in dispute.

### VIII. <u>Qualified Immunity Does Not Protect the Individual Defendants (Counts I-IV, VI-VII).</u>

Resolving an assertion of qualified immunity involves a consideration of two factors: "(1) whether a constitutional right was violated **using plaintiff's version of the facts**, and (2) whether that right was clearly established at the time." *Surita v. Hyde*, 665 F.3d 860, 868 (7th Cir. 2011) (citations omitted) (emphasis added). Defendants' qualified immunity defense fails because the constitutional rights at issue were clearly established at the time of the alleged violations. *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), clearly established that content-based and viewpoint-based speech restrictions receive strict scrutiny. *Saia v. New York*, 334 U.S. 558 (1948), established that complete bans on amplification violate the First Amendment. The Amended Complaint alleges that the individual officers participated in an unconstitutional arrest while discriminating against Plaintiffs' religious viewpoint. Reasonable officers would know that religious speech receives heightened protection and that content-based and viewpoint-based enforcement of noise ordinances requires strict scrutiny.

Moreover, because disputed issues of material fact underlie Plaintiffs' claims, Defendants cannot possibly be granted qualified immunity at the pleading stage. *See, e.g.*, *Walsh v. Kaluzny*

*Brother's Inc.*, No. 14-cv-3412, 2015 U.S. Dist. LEXIS 147812, at *16 (N.D. Ill. Oct. 30, 2015) ("The issue of whether defendants violated Walsh's Fourth Amendment rights by arresting him without probable cause cannot be disentangled from disputed facts, and consequently defendants are not entitled to qualified immunity at this phase.").

### IX.    Plaintiffs Have Adequately Alleged An IRFRA Claim (Count V).

The Illinois Religious Freedom Restoration Act ("IRFRA") prohibits government from substantially burdening a person's exercise of religion unless the burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. 775 ILCS 35/15. Defendants' enforcement actions directly burden Plaintiffs' sincere religious exercise by criminalizing their practice of amplified street preaching.

Amplified preaching is integral to Plaintiffs' religious practice. As alleged in the Complaint, "without amplification, they would need to raise their voice to be understood by passersby, which would distort the tone of their message." Doc. 17 at ¶ 125. The arrest and prosecution of Plaintiffs for engaging in this religious practice constitutes a substantial burden under IRFRA. Assuming *arguendo* that Defendants have a compelling interest in noise regulation, this enforcement fails the least restrictive means test. Rather than applying the Ordinance's actual standards—a specific volume measurement at a defined distance—Defendants enforce a blanket prohibition on religious amplification. This broad prohibition is not narrowly tailored and fails to employ the least restrictive means of achieving any legitimate governmental purpose.

Even if Plaintiffs cannot obtain monetary damages under the IRFRA, Plaintiffs seek injunctive and declaratory relief that is not subject to the Tort Immunity Act. This relief is essential to prevent future constitutional violations.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in its entirety. Defendants improperly seek to convert this motion into one for summary judgment by relying on disputed body camera footage not incorporated in the Amended Complaint. Plaintiffs have adequately pleaded constitutional violations under the First, Fourth, and Fourteenth Amendments, as well as violations of the Illinois Religious Freedom Restoration Act. The alleged systematic enforcement pattern, combined with the concurrent litigation establishing a broader municipal policy, satisfies the requirements for municipal liability under § 1983.

Respectfully Submitted,


/s/Nathan J. Moelker
Nathan Moelker
Liam Harrell
AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave., NE
Washington, DC 20002
Tel: (202) 641-9160
Fax: (202) 546-9309
lharrell@aclj.org
nmoelker@aclj.org

Geoffrey R. Surtees
AMERICAN CENTER FOR LAW & JUSTICE
PO Box 60
New Hope, KY 40052
Tel: (502) 549-7020
Fax: (502) 549-5252
gsurtees@aclj.org

Charles E. Hervas
Kaleah M. Ault
HERVAS, CONDON & BERSANI, PC
333 W. Pierce Rd., Ste. 195
Itasca, IL 60143
chervas@hcbattorneys.com
kault@hcbattorneys.com


*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that on July 25, 2025, he caused a copy of the foregoing Plaintiffs' Response to the Defendants' Motion to Dismiss to be e-filed using the CM/ECF e-filing system which will serve all parties of record.

*/s/ Nathan J. Moelker*