**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BRETT RAIO; PEREZ NDI; and REETIK DHAMALA, | ) ) ) | |
| Plaintiffs, | ) ) | No. 25 C 2709 |
| v. | ) ) | Judge Sara L. Ellis |
| CITY OF CHICAGO, an Illinois municipal Corporation; and Chicago Police Officers MARIO L. JACKSON, NICO A. SUTOR, CARLOS R. CAMEY SANDOVAL, MICHAEL P. JOYCE, WILLIAM E. GATLIN, and MICHAEL PETRASKI, in their official and individual capacities, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiffs Brett Raio, Perez Ndi, and Reetik Dhamala frequently share the Gospel on the streets of Chicago using an amplification machine, colloquially known as "street preaching." After Chicago police officers cited or arrested Plaintiffs for violating the City of Chicago's sound amplification ordinance on two separate occasions, Plaintiffs brought this § 1983 action against the City of Chicago and Chicago Police Officers Mario L. Jackson, Nico A. Sutor, Carlos R. Camey Sandoval, Michael P. Joyce, William E. Gatlin, and Michael Petraski (the "Defendant Officers"), in their official and individual capacities. In their amended complaint, Plaintiffs allege that Defendants violated the First Amendment (Counts I, II, VII, and VIII), Fourth Amendment (Count VI), and Fourteenth Amendment (Counts III, IV, VII, and VIII), as well as the Illinois Religious Freedom Restoration Act ("IRFRA") (Count V). Defendants have moved to dismiss all counts for failing to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Because Plaintiffs sufficiently allege First Amendment retaliation, free exercise, false

arrest, retaliatory arrest, and IRFRA claims, but not a vagueness, equal protection, or free speech as applied claim, the Court grants in part and denies in part Defendants' motion.

## BACKGROUND[1]

Three Plaintiffs brought this case after City of Chicago police officers cited or arrested them on two separate dates for using amplification without a permit at the intersection of East Madison Street and North Michigan Avenue next to Millenium Park in Chicago, Illinois (the "Madison/Michigan Intersection"). The Municipal Code of Chicago ("MCC") § 8-32-070 prohibits amplified sound "louder than average conversational level at a distance of 100 feet or more, measured vertically or horizontally, from the source" (the "Amplification Ordinance").

### I.       Plaintiffs

Plaintiff Brett Raio is a full-time Gospel singer and entrepreneur based out of Maine. He travels around the country to evangelize in public areas, frequently using amplification for his performance. He is well-versed in amplification case law and always carries a fact sheet describing First Amendment law regarding the use of amplification.

Plaintiff Perez Ndi is a street preacher based out of Chicago, Illinois. When he immigrated to the United States from Cameroon, Ndi felt a calling to deliver religious prophecies to the public. He has since evangelized in Chicago and around the country.

Plaintiff Reetik Dhamala is a street preacher based out of Wheaton, Illinois. When he immigrated to the United States from Nepal, Dhamala joined a local Nepali church, participates as an active member, and assists local street preachers.

---

[1] The Court takes the facts in the background section from Plaintiffs' amended complaint and presumes them to be true for the purpose of resolving Defendants' motion to dismiss. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013).

**II.**     **December 10, 2024**

On December 10, 2024, Raio, Ndi, and Dhamala engaged in street preaching at the Madison/Michigan Intersection.  They used a microphone connected to a battery-powered speaker, which Ndi owned, to amplify their voices.  They also played music from the speaker and livestreamed their preaching on social media.

Shortly before 11:00 a.m., an individual approached and heckled Plaintiffs.  Plaintiffs moved the speaker away from the individual to appease him, but the individual continued to heckle the group.  Raio told the individual, "This is the best we can do because we still want everyone to hear the Gospel, you know."  Doc. 17 ¶ 25.  Upon Plaintiffs' information and belief, this individual called the police about Plaintiffs' street preaching.

Around 11:15 a.m., a Chicago Police Department ("CPD") car drove up to the Madison/Michigan Intersection and started watching Plaintiffs.  Then Defendant Officers Jackson and Sutor stepped out of their car, wearing their CPD badges, and started toward the three men.  As Officers Jackson and Sutor approached, Raio took his phone from his pocket and began recording them.  Officer Jackson ordered Plaintiffs to lower the sound and demanded to see their permit.  In response, Raio stated, "Officer there's no permit for the First Amendment." *Id.*  Officer Jackson then told Plaintiffs they needed a permit and turned off and grabbed the speaker.  Ndi said, "Hey don't touch our speaker!" and reached for the machine, but Officer Jackson kicked the speaker back about four feet and grabbed Ndi by the collar and wrist, threatening him with handcuffs. *Id.*  Although Plaintiffs told Officers Jackson and Sutor that they did not possess a permit and were exercising their First Amendment right to free speech, Officers Jackson and Sutor continued to question Plaintiffs about a permit.  Plaintiffs repeatedly asked the Officers to identify themselves, but they did not do so.

3

Eventually, Officer Jackson put handcuffs on Raio.  Raio asked if Officer Jackson was detaining him, to which Officer Jackson responded "Yes, you are being detained, I asked you for a permit."  *Id.* at 6.  Raio asked the Officers multiple questions, including for more information on what crime he committed, for the opportunity to speak with a supervisor, and for the chance to share information and U.S. Supreme Court precedent about his First Amendment rights, but the Officers ignored these questions and only told Raio that he could not have amplified music there.  The Officers consistently suggested that any noise amplification was illegal.

Officer Sandoval, a supervising officer, arrived a few minutes later.  He ignored Raio's attempts to speak with him and told Officers Jackson and Sutor to "yeah arrest him, do whatever you need to do."  *Id.*  At one point, one of the Officers told Raio that he was going to take Raio to jail for playing amplified music.  Raio remained handcuffed for over twenty minutes, despite never resisting or otherwise demonstrating any threat.  At one point, the heckler reappeared and yelled at Plaintiffs, threatening to call the police every time Plaintiffs were present at the Madison/Michigan Intersection.

The Officers charged Raio with violating MCC § 8-4-055, which prohibits any person from using sound-emitting devices on public conveyances, and § 2-84-300(a), which forbids resisting a police officer or aiding escape.  The Officers gave Raio an Administrative Notice of Violation ("ANOV") that ordered him to appear at the Chicago Department of Administrative Hearings on February 21, 2025.  The Officers left after serving Raio with the ANOV.

Throughout this incident, the amplitude of the sound remained low.  Plaintiffs, who had a decibel meter with them, measured their volume after the Officers left.  Their preaching's decibel was a consistent 74db.  In comparison, the ambient noise of downtown Chicago measured between 71 and 85db.  While the Officers never used a decibel meter, they mentioned to

4

Plaintiffs that the citizen who called in a complaint about Plaintiffs had measured their sound with a decibel meter application and determined it was "too loud" without further specificity. *Id.* at 7.  At the hearing on February 21, 2025, Raio's counsel showed a video taken of the encounter to the prosecuting attorney, who then dismissed both charges.

### III.     February 24, 2025

Ndi and Dhamala returned to the Madison/Michigan Intersection to preach on February 24, 2025.  Officers Joyce and Gatlin arrived in a police car, got out of their car, and started yelling at Ndi and Dhamala to turn down the volume.  The Officers accused Ndi and Dhamala of violating Chicago noise ordinances.  In response, Ndi and Dhamala told the Officers about Raio's case and their constitutional right to preach, but the Officers continued to order them to stop their behavior.  Dhamala asked the Officers if they had conducted a sound reading of his speech's volume, but an Officer replied that the ordinance does not require such a reading.  Then the Officers handcuffed, arrested, and transported Ndi and Dhamala to jail, where they remained for approximately seven hours.  When jail officials released Ndi and Dhamala, they did not return the men's speaker, microphone, and camera stand.

Officers charged Ndi and Dhamala with violating MCC § 8-32-070, which prohibits music and amplified sound that is louder than average conversational level at one hundred feet or more from the source.  The State charged Ndi and Dhamala criminally, and they received pretrial release conditions.[2]

---

[2] As of the dates of the filing of Defendants' motion to dismiss and Plaintiffs' response, Ndi and Dhamala's charges were pending trial.  The Court is unaware of what happened following their bench trial, allegedly set for September 11, 2025.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

### I.    Body Camera Footage

As a preliminary matter, Defendants ask the Court to consider the Defendant Officers' body camera footage. Although the Court normally cannot consider extrinsic evidence without converting a motion to dismiss into one for summary judgment, *Jackson v. Curry*, 888 F.3d 259, 263 (7th Cir. 2018), the Court may consider "documents that are central to the complaint and are referred to in it" in ruling on a motion to dismiss, *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). Here, Plaintiffs' amended complaint does not reference the Defendant Officers' body camera footage. Instead, the amended complaint only mentions Plaintiffs' livestream video footage and Raio's own phone recording. And the Court does not agree with Defendants'

argument that Plaintiffs' reference to their own footage in the amended complaint allows the Court to consider *Defendants'* footage.

But courts retain discretion, even at the pleadings stage, to take judicial notice of facts in the public record that are "not subject to reasonable dispute" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). Courts have taken judicial notice of police body camera footage only when the footage "utterly discredit[s]" a plaintiff's account. *Luczynski v. Joroan*, No. 23 C 17184, 2024 WL 3106101, at *2 (N.D. Ill. June 24, 2024) (quoting *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)); *see also Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016) (considering video evidence that "blatantly contradicted" a plaintiff's allegations). Although the Seventh Circuit has accepted that district courts may rely on such video evidence to rule on a motion to dismiss, it has cautioned such reliance when the video "does not clearly and definitively discredit the non-movant's facts." *Esco v. City of Chicago*, 107 F.4th 673, 679 (7th Cir. 2024); *see also Kailin v. Vill. of Gurnee*, 77 F.4th 476, 481–82 (7th Cir. 2023) (declining to apply the *Scott* exception when video does not clearly show the events in question); *Eagan v. Dempsey*, 987 F.3d 667, 691 n.56 (7th Cir. 2021) (noting that the *Scott* exception is a narrow and pragmatic one reserved only in cases where there is clear and irrefutable video evidence).

Here, Defendants' body camera footage clearly shows both incidents in their entirety, and Plaintiffs do not contest the footage's accuracy. Instead, Plaintiffs argue that the footage does not blatantly contradict or discredit their facts. The Court agrees. The videos and Plaintiffs' version of events largely mirror each other. Further, although the videos contain audio, the Court cannot discern the true volume of Plaintiffs' amplification from the footage—a central disputed

factual issue that is inappropriate to determine at this stage.  *See Ferguson v. McDonough*, 13 F.4th 574, 581 (7th Cir. 2021) (declining to apply the *Scott* exception where the video was open to interpretation and did not utterly discredit the plaintiff's version of the facts).  Accordingly, the Court will not consider the Defendant Officers' body camera footage.

## II.     Municipal Liability (Counts I, II, III, IV, VI, VII)

Defendants argue that Plaintiffs' § 1983 claims against the City all fail because Plaintiffs allege no basis for municipal liability.  To assert a claim against the City under § 1983, Plaintiffs must allege "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).  Liability may rest on (1) an express policy that, when enforced, causes a constitutional violation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) a constitutional injury caused by a person with final policymaking authority.  *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000).

Plaintiffs concede that no express policy or decision by a final policymaker is at issue. They instead allege that the City maintains an unwritten custom or practice to enforce its Amplification Ordinance selectively against street preachers.  Specifically, Plaintiffs contend that the City has adopted a "de facto policy of arresting street preachers, regardless of evidence, simply for sharing the Gospel on the streets of Chicago" and "cite[s] all street preachers, regardless of whether they meet the requirements" of the Amplification Ordinance.  Doc. 17 ¶¶ 1, 87.  Defendants argue that Plaintiffs have provided only conclusory allegations that do not suggest the required widespread pattern or practice, instead improperly relying solely on their

8

own experiences. *See Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015) (a *Monell* claim requires "a widespread practice that permeates a critical mass of an institutional body," not "individual misconduct"); *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) ("[I]t is necessarily more difficult for a plaintiff to demonstrate an official policy or custom based only on his own experience because what is needed is evidence that there is a true municipal policy at issue, not a random event." (citation omitted) (internal quotation marks omitted)).

But Defendants ask too much of Plaintiffs at the pleading stage, at which the Court need only determine whether Plaintiffs have sufficiently alleged their *Monell* claims under the dictates of *Iqbal* and *Twombly*. *See White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016) (federal courts do not apply a "heightened pleading standard" to *Monell* claims). Indeed, courts have recognized that *Monell* claims may proceed "even with conclusory allegations that a policy or practice existed, so long as facts are pled that put the defendants on proper notice of the alleged wrongdoing." *Armour v. Country Club Hills*, No. 11 C 5029, 2014 WL 63850, at *6 (N.D. Ill. Jan. 8, 2014) (quoting *Riley v. Cnty. of Cook*, 682 F. Supp. 2d 856, 861 (N.D. Ill. 2010)).

Plaintiffs have included sufficient factual allegations to put Defendants on notice of the alleged wrongdoing, tying their citations and arrests to Defendants' alleged policy or practice of enforcing their Amplification Ordinance selectively against street preachers. Plaintiffs include specific allegations of two instances, involving different police officers, in which they claim Defendants arrested them even though their sound's amplitude remained low. The fact that Plaintiffs do not include specific details of other individuals' experiences does not warrant dismissal, particularly because their allegations suggest widespread practices, not isolated events. *See Williams v. City of Chicago*, No. 16-cv-8271, 2017 WL 3169065, at *8–9 (N.D. Ill. July 26, 2017) (noting that post-*White* courts analyzing *Monell* claims "have 'scotched motions to

dismiss' premised on arguments that the complaint does not contain allegations beyond those relating to the plaintiff," collecting cases); *Barwicks v. Dart*, No. 14-cv-8791, 2016 WL 3418570, at *4 (N.D. Ill. June 22, 2016) (at summary judgment, a single incident cannot establish a *Monell* claim, but at the motion to dismiss stage, a plaintiff "need only allege a pattern or practice, not put forth the full panoply of evidence from which a reasonable factfinder could conclude such a pattern exists"). Discovery will uncover whether Plaintiffs can prove their *Monell* claims, but at the pleading stage, they have stated a plausible claim for relief. *See Shields v. City of Chicago*, No. 17 C 6689, 2018 WL 1138553, at *4 (N.D. Ill. Mar. 2, 2018) ("[T]he City's arguments that Plaintiff's allegations do not 'establish' the existence of a widespread policy are misplaced because at this stage of the proceedings, the Court must determine whether Plaintiff has stated a plausible claim for relief, not that he has 'established' or 'proven' his claims.").

## III. Vagueness Claims (Counts III and VIII)

In Counts III and VIII, Plaintiffs allege that the Amplification Ordinance and Defendants' unwritten policy of enforcing the Amplification Ordinance against street preachers are impermissibly vague under the First and Fourteenth Amendments.

### A. Challenge to an "Unwritten Policy" (Count III)

Plaintiffs allege that Defendants maintain an unwritten policy that is impermissibly vague in violation of the Fourteenth Amendment's Due Process clause. Defendants argue that the Court must dismiss this claim because vagueness challenges focus on a law or policy's text, making analysis impossible for an allegedly unwritten policy. In their response brief, Plaintiffs do not address this argument and accordingly concede it. *See ATC Healthcare Servs., Inc. v. RCM Techs., Inc.*, 282 F. Supp. 3d 1043, 1050 (N.D. Ill. 2017) ("Failure to respond to an

10

argument in a motion to dismiss permits an inference of acquiescence to the argument which acts as a waiver."); *Midwest Generation EME, LLC v. Continuum Chem. Corp.*, 768 F. Supp. 2d 939, 950 (N.D. Ill. 2010) (collecting cases) (noting that "failure to respond to an opposing party's argument implies concession").  Plaintiffs may not have responded to this argument because "Due Process-based vagueness challenges have not been extended beyond the statutory sphere or, at most, to written rules and regulations," and not to unwritten policies.  *Am. Ass'n of Univ. Professors v. Rubio*, 780 F. Supp. 3d 350, 384 (D. Mass. 2025).[3]  Plaintiffs, thus, cannot proceed with their vagueness challenge to Defendants' alleged unwritten policy.

### B.      Challenge to the Amplification Ordinance (Count VIII)

Plaintiffs allege that the Amplification Ordinance is unconstitutionally vague and overbroad because it causes "persons of common intelligence to guess at its meaning and differ as to its application" because it "does not specify the decibel level at which sound is prohibited." Doc. 17 ¶ 152.  Defendants argue that the Amplification Ordinance is not unconstitutionally vague because it provides fair notice and sufficient guidance for enforcement.

"A statute can be impermissibly vague for either of two independent reasons.  First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement."  *Hill v. Colorado*, 530 U.S. 703, 732 (2000).  Relatedly, a vague statute "abut(s) upon sensitive areas of basic First Amendment freedoms" if "it operates to inhibit the exercise of (those) freedoms."  *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (citations omitted) (internal quotation marks omitted).

---

[3] The plaintiff in this case brought a vagueness challenge under the Fifth Amendment's Due Process Clause.  But the analysis remains the same.  *See Planned Parenthood of Indiana & Kentucky, Inc. v. Marion Cnty. Prosecutor*, 7 F.4th 594, 598 (7th Cir. 2021) ("The Supreme Court has long held that overly vague laws are unconstitutional under the Due Process Clause of the Fifth and Fourteenth Amendments.").

First, "[t]o survive a vagueness challenge, a . . . statute must give people fair notice of what conduct is prohibited so that they may conduct themselves within the law's bounds." *Brown v. Kemp*, 86 F.4th 745, 772 (7th Cir. 2023). "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *United States v. Williams*, 553 U.S. 285, 306 (2008). In other words, "the indeterminacy of what conduct constitutes a violation makes a statute vague." *Brown*, 86 F.4th at 772.

Plaintiffs contend that the Amplification Ordinance's use of "average conversational level" is inherently subjective because it does not specify a decibel measurement, thus failing to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. This Court, however, disagrees. While people's average conversational level may vary slightly, the likelihood that anyone would not understand these familiar words seems remote. *See Grayned*, 408 U.S. at 110 (rejecting vagueness challenge to an anti-noise ordinance marked by "flexibility and reasonable breath, rather than meticulous specificity" because "it [was] clear what the ordinance as a whole prohibits"). Further, the Amplification Ordinance defines "average conversational level" as "a level at which normal, unamplified speech is clearly and distinctly audible above ambient noise level," MCC § 8-32-020, with "ambient noise level" meaning "the sound level at a given location that exists as a result of the combined contribution in that location of all sound sources, excluding the contribution of a source or sources under investigation for violation of this Code," *id.* As the Supreme Court has emphasized, because lawmakers are "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Grayned*, 408 U.S. at 110. And courts have rejected vagueness challenges to similar anti-noise ordinances. *See, e.g.*, *id.* at 107–08 (rejecting vagueness challenge to an

12

ordinance that prohibited noise based on whether it "disturbs" a nearby school); *Howard Opera House Assocs. v. Urban Outfitters*, 322 F.3d 125, 128 (2d Cir. 2003) (rejecting vagueness challenge to an ordinance prohibiting "loud or unreasonable noise").

A law can also be unconstitutionally vague if it "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732. Plaintiffs allege that because the Amplification Ordinance does not contain a decibel limit, officers can arbitrarily and discriminatorily enforce it. But the lack of a specific decibel limit does not necessarily lead to arbitrary enforcement. That is especially true where the ordinance uses an "average conversational level" to narrow officers' enforcement. Accordingly, although "enforcement requires the exercise of some degree of police judgment, [ ] as confined, that degree of judgment here is permissible." *Grayned*, 408 U.S. at 114.

Finally, Plaintiffs have not sufficiently alleged that the Amplification Ordinance is so vague as to have a "potential chilling effect on protected expression." *Ctr. For Individual Freedom v. Madigan*, 697 F.3d 464, 470–71 (7th Cir. 2012). "Even under the heightened standard for the First Amendment, . . . the potential chilling effect on protected expression must be both 'real and substantial' to invalidate a statute as void for vagueness in a facial challenge." *Id.* at 479 (citing *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975)). Plaintiffs have not alleged how the Amplification Ordinance chills their protected expression. And this Court does not see a way in which they could, for the Amplification Ordinance still allows Plaintiffs to street preach without an amplification machine or with an amplification machine but turned down to a lower volume. The Court, therefore, dismisses Count VIII.

13

## IV.     Free Speech (Count I)

Defendants argue that Plaintiffs have not pleaded non-conclusory facts sufficient to allege a First Amendment free speech claim regarding the facial neutrality of the Amplification Ordinance.  Plaintiffs respond that their free speech claim does not stem from the facial neutrality of the Amplification Ordinance, but rather Defendants' allegedly discriminatory *application* of that ordinance.  Specifically, Plaintiffs claim that Defendants' selective enforcement of the Amplification Ordinance constitutes viewpoint and content-based discrimination and retaliation.

### A.     As-Applied Challenge

Plaintiffs admit that the Amplification Ordinance is "facially neutral."  Doc. 43 at 22. The Court therefore does not address any allegations that concern a facial attack on the Amplification Ordinance.  Instead, Plaintiffs challenge Defendants' enforcement of the Amplification Ordinance, alleging that Defendants have systemically applied the ordinance in a discriminatory manner to suppress religious speech.

The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits laws that "abridge[e] the freedom of speech."  U.S. Const. amend. I.  Pursuant to that clause, the government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)).  Laws that target speech based on its communicative content are "presumptively unconstitutional."  *See id.*  "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant."  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).  Thus, viewpoint discrimination is an egregious form of content

discrimination. *Id.* To substantiate a claim for First Amendment viewpoint and content discrimination, Plaintiffs must plead that (1) government officials regulated their speech and (2) that the regulation was motivated by the ideology or the opinion or perspective that they wished to express. *Id.*

Here, the parties dispute whether the Defendant Officers' actions, through their enforcement of the Amplification Ordinance against street preachers, are content neutral. According to Plaintiffs, the Defendant Officers have distinguished between speech based on its content (*i.e.*, religious versus secular), therefore creating a content-based restriction. In their amended complaint, Plaintiffs allege that Chicago police officers "cite all street preachers, regardless of whether they meet the requirements of the [Amplification Ordinance] and regardless of the evidence," Doc. 17 ¶ 87, and "engag[e] in a targeted practice of enforcing their interpretation of the [Amplification Ordinance] against only religious speakers," *id.* ¶ 91. Defendants argue that the Amplification Ordinance is instead a content-neutral time, place, and manner regulation. The Court evaluates content-based restrictions under strict scrutiny but assesses content-neutral "time, place, or manner" restrictions under an intermediate level of scrutiny. *Price v. City of Chicago*, 915 F.3d 1107, 1109 (7th Cir. 2019).

Plaintiffs have failed to allege a single instance in which they, or anyone similarly situated, used amplification to communicate a non-religious message without consequence. Nor do they allege that secular speakers regularly violate the Amplification Ordinance without any police intervention. Plaintiffs instead include only conclusory allegations that Defendants enforce the Amplification Ordinance against religious speakers in a discriminatory manner extrapolated from the two instances in which the Defendant Officers interacted with them. Thus, Plaintiffs have not sufficiently alleged that Defendants have selectively enforced the

15

Amplification Ordinance.  *See U.S. Labor Party v. Oremus*, 619 F.2d 683, 691 (7th Cir. 1980)

("An individual must allege facts to show that while others similarly situated have generally not

been prosecuted, he has been singled out for prosecution, and that the discriminatory selection of

him was based upon an impermissible consideration such as . . . the desire to prevent his exercise

of constitutional rights."); *cf. Price v. City of Chicago*, No. 16 C 8268, 2017 WL 36444, at *10–

11 (N.D. Ill. Jan. 4, 2017) (allowing the plaintiffs' as-applied selective enforcement theory to

survive a motion to dismiss because the plaintiffs alleged at least fifteen examples of improper

enforcement of the ordinance at issue while other groups regularly violated the ordinance

without any police intervention), *aff'd*, 915 F.3d 1107 (7th Cir. 2019).

### B.    Retaliation

Plaintiffs allege that Defendants retaliated against them for engaging in constitutionally

protected speech in violation of the First Amendment.[4]  To plead a First Amendment retaliation

claim, Plaintiffs must allege that: "(1) [their] speech was constitutionally protected; (2) [they

have] suffered a deprivation likely to deter free speech; and (3) [their] speech was at least a

motivating factor in [Defendants'] actions." *Peele v. Burch*, 722 F.3d 956, 959 (7th Cir. 2013)

(quoting *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012)).  Defendants, however, do

not develop arguments for the dismissal of Plaintiffs' general First Amendment retaliation claim,

instead only raising arguments to dismiss Plaintiffs' retaliatory arrest claim (Count VII).

Because Defendants do not move for dismissal of this claim, Plaintiffs may proceed with this

theory.

## V.    Free Exercise (Count II)

Plaintiffs do not allege that the Amplification Ordinance burdens their religious exercise.

*See* Doc. 43 at 26.  Plaintiffs instead contend that Defendants violated their First Amendment

---

[4] The Court addresses Dhamala and Ndi's retaliatory arrest claim separately.

free exercise rights by burdening their religious beliefs via an unwritten policy and custom of targeting religious activity. "To state a claim that the Free Exercise Clause of the First Amendment has been violated, a plaintiff must plausibly allege that a government entity burdened a sincere religious practice pursuant to a policy that was not neutral or generally applicable." *Troogstad v. City of Chicago*, No. 25-1575, 2025 WL 3524720, at *2 (7th Cir. Dec. 9, 2025). In evaluating free exercise claims, courts first ask whether the government mandate is a neutral requirement of general applicability that only incidentally burdens religion. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021); *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 996 (7th Cir. 2006). If it is, then a court's assessment of the law is limited to rational basis review. *Ill. Bible Colls. Ass'n v. Anderson*, 870 F.3d 631, 639 (7th Cir. 2017). But when a law targets certain religious practices, courts apply strict scrutiny. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546–47 (1993). A government policy can survive strict scrutiny only if it advances "interests of the highest order" and is narrowly tailored to achieve those interests. *Fulton*, 593 U.S. at 541 (quoting *Church of Lukumi*, 508 U.S. at 546).

In this case, Plaintiffs provide enough facts that Defendants' unwritten policy targeting amplified religious speech imposes, at least plausibly, an unjustifiably substantial burden on Plaintiffs' free exercise of religion for the claim to move forward. As discussed when considering whether Plaintiffs have alleged a basis to hold the City liable under *Monell*, Plaintiffs allege that Defendants apply the Amplification Ordinance in a discriminatory manner such that Chicago police officers target street preachers. Assuming Plaintiffs' claims are true, as required at the pleading stage, Defendants' unwritten policy leaves Plaintiffs with a choice: abstain from amplified street preaching or engage in the practice and risk more citations and arrests. Such a policy could plausibly run afoul of the First Amendment. *See Baumgartner v.*

*City of Chicago*, 759 F. Supp. 3d 868, 878 (N.D. Ill. 2024) (allowing the plaintiff's free exercise claim to move forward where he provided enough facts that the defendant's attestation form imposes an unjustifiably substantial burden on the plaintiff's free exercise of religion). Although Defendants contest whether their actions substantially burden Plaintiffs' free exercise because amplification is not necessary to practice their religion, Plaintiffs have sufficiently alleged enough facts to survive dismissal. *See Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016) ("A substantial burden puts substantial pressure on an adherent to modify his behavior and to violate his beliefs.").

## VI.    Equal Protection (Count IV)

Plaintiffs rest their equal protection claim on Defendants' "systemic targeting of religious speakers." Doc. 43 at 28. Defendants argue that Plaintiffs do not adequately allege that Defendants applied the Amplification Ordinance against Plaintiffs differently based on their religion nor that Defendants enforced the Amplification Ordinance with a discriminatory purpose. The Equal Protection Clause of the Fourteenth Amendment prohibits state action that "discriminates on the basis of membership in a protected class." *Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010). To survive a motion to dismiss an equal protection claim, Plaintiffs must plausibly allege that: (1) the state actor treated them differently based upon membership in a protected class, and (2) the state actor acted with discriminatory intent. *Word v. City of Chicago*, 946 F.3d 391, 396 (7th Cir. 2020); *Doe v. Bd. of Educ.*, 611 F. Supp. 3d 516, 532 (N.D. Ill. 2020).

As noted, Plaintiffs have adequately alleged that Defendants maintained an unwritten policy or custom of citing and arresting street preachers. But Plaintiffs have not alleged any instances where police officers declined to cite or arrest any similarly situated secular individuals

18

under similar conditions. *See Britt v. Peoria Cnty.*, No. 11-1034, 2011 WL 1979859, at *2 (C.D. Ill. May 20, 2011) (dismissing racial profiling equal protection claim in part because the plaintiff failed to name similarly situated individuals whom officers did not stop and search under similar conditions). As such, Plaintiffs' non-conclusory allegations fail to suggest that Defendants acted with a discriminatory intent and, consequently, the Court must dismiss Plaintiffs' equal protection claim. *See Williams v. McLean Cnty.*, No. 25-CV-1405, 2025 WL 2823600, at *2 (C.D. Ill. Oct. 3, 2025) (dismissing the plaintiff's class-membership equal protection claim because she did not allege that the defendant acted with discriminatory intent or treated her differently from others similarly situated).

## VII.   False Arrest (Count VI)

Defendant Officers Joyce, Gatlin, and Petraski argue that they had probable cause to arrest Ndi and Dhamala and thus Plaintiffs' false arrest claim fails.[5] To prevail on a false arrest claim under § 1983, a plaintiff must show that there was no probable cause for his arrest. *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) ("Probable cause is an absolute bar to a claim of false arrest asserted under the Fourth Amendment and section 1983." (quoting *Stokes v. Bd. of Educ.*, 599 F.3d 617, 622 (7th Cir. 2010))). A police officer has probable cause to arrest a person if, at the time of the arrest, the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). The Seventh Circuit has emphasized that the probable cause inquiry is "purely objective," and "the officer's subjective state of mind and beliefs are irrelevant." *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 714 (7th Cir. 2013).

---

[5] Plaintiffs do not allege that Officers Jackson, Sutor, and Sandoval were involved in the arrests of Ndi and Dhamala. Further, Plaintiffs only allege that Officer Petraski "participated in the arrest of Ndi and Dhamala" without any further mention. *See* Doc. 17 ¶ 22.

The Court concludes that Plaintiffs' own account of the events, as stated in their amended complaint, suggests that Officers Joyce, Gatlin, and Petraski did not have probable cause to arrest Ndi and Dhamala. Plaintiffs allege that Ndi and Dhamala were street preaching using an amplification machine at the Madison/Michigan Intersection when Officers Joyce and Gatlin arrived and told them that they were violating Chicago noise ordinances and to turn down their volume. *See* Doc. 17 ¶¶ 61–62. However, regardless of Officers Joyce and Gatlin's subjective belief that Plaintiffs' amplification violated the Amplification Ordinance, Plaintiffs allege that Officers Joyce and Gatlin had "no evidence that [Ndi and Dhamala] had committed any crime," Doc. 17 ¶ 133, and that Ndi and Dhamala asked Officers Joyce and Gatlin if "they had conducted a sound reading of the volume of [Dhamala's] speech" because Plaintiffs contest that their amplification's volume violated the Amplification Ordinance, *id.* ¶ 64. Because the Court must accept the facts in Plaintiffs' amended complaint and draw all reasonable inferences in their favor, the Court concludes that Plaintiffs have adequately alleged that Officers Joyce and Gatlin had no probable cause to arrest Ndi and Dhamala. *See Robinson v. Lake Cnty.*, No. 25-CV-2668, 2025 WL 3533864, at *6 (N.D. Ill. Dec. 10, 2025) (determining that because the Court has to accept the plaintiff's version of events at the motion to dismiss stage, the plaintiff has adequately alleged that the defendants had no probable cause to arrest him, even if future evidence may reveal additional facts available to the defendants at the time of arrest that would support a probable cause finding). Accordingly, Plaintiffs may proceed on their false arrest claim.

## VIII.   Retaliatory Arrest (Count VII)

Like a false arrest claim, the presence of probable cause generally defeats a First Amendment retaliatory arrest claim. *See Nieves v. Bartlett*, 587 U.S. 391, 405 (2019). The Supreme Court has acknowledged a "narrow qualification" to this general rule for

"circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Id.* at 406. The "no-probable-cause requirement" does not apply when a plaintiff alleges that "he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* at 407.

Because Plaintiffs have alleged that Officers Joyce, Gatlin, and Petraski did not have probable cause to arrest Dhamala and Ndi, their First Amendment retaliatory arrest claim may proceed to discovery.

## IX. Qualified Immunity (Counts I, II, III, IV, VI, VII)

The Defendant Officers argue that the Court must dismiss any constitutional claims against them because they are entitled to qualified immunity. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (citation omitted) (internal quotation marks omitted). "In other words, qualified immunity shields from liability [ ] officers who act in ways they reasonably believe to be lawful." *Ewell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017) (quoting *Jewett v. Anders*, 521 F.3d 818, 822 (7th Cir. 2008)) (internal quotation marks omitted). Defendants typically present qualified immunity as a defense at the summary judgment stage, but they can also present it in a motion to dismiss. *See Stevens v. Umsted*, 131 F.3d 697, 706 (7th Cir. 1997); *Rusinowski v. Vill. of Hillside*, 835 F. Supp. 2d 641, 650 (N.D. Ill. 2011). At this stage, to overcome an assertion of qualified immunity, Plaintiffs must allege a violation of a statutory or constitutional right that was clearly established at the time of the violation so that a reasonable officer would have known of the unlawfulness of his conduct. *Hanson v. LeVan*, 967 F.3d 584, 592 (7th Cir. 2020).

As noted above, for the purposes of this motion, Plaintiffs have presented sufficient allegations that demonstrate that the Defendant Officers violated Plaintiffs' constitutional rights, including their First and Fourth Amendment rights. And these alleged actions violate clearly established constitutional rights. *See, e.g.*, *Schimandle v. Dekalb Cnty. Sheriff's Off.*, 114 F.4th 648, 655 (7th Cir. 2024) ("There is no question that [the plaintiff's] constitutional right to be free from arrest without probable cause was clearly established at the time of the incident." (quoting *Fleming v. Livingston Cnty.*, 674 F.3d 874, 879 (7th Cir. 2012))); *Hoskins v. Swisher*, No. 20-CV-302, 2023 WL 2600214, at *8 (S.D. Ill. Mar. 22, 2023) (finding the defendants are not entitled to qualified immunity because the actions purportedly taken by the defendants, which include retaliating against the plaintiff for exercising his First Amendment rights, violated clearly established constitutional rights).

However, specific to Plaintiffs' false arrest Fourth Amendment claim, qualified immunity protects the Officers Joyce, Gatlin, and Petraski if a reasonable officer could have believed that he had probable cause to arrest Ndi and Dhamala in light of the information Officers Joyce, Gatlin, and Petraski possessed at the time. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). Courts have referred to this standard as "arguable probable cause." *Abbott*, 705 F.3d at 715. "Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Hunter*, 502 U.S. at 227 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). At this stage, the Court must consider only the factual assertions included in the amended complaint when evaluating Officers Joyce, Gatlin, and Petraski's knowledge at the time of the arrests and whether those facts amount to arguable probable cause.

While Plaintiffs allege that Officers Joyce and Gatlin told Ndi and Dhamala to lower their amplifier's volume because the noise level violated a Chicago ordinance, Plaintiffs also

22

consistently allege throughout their amended complaint that they never violated any ordinance and kept their amplifier's volume low. At the motion to dismiss stage, these conflicting allegations prevent the Court from making a definitive determination as to whether Officers Joyce, Gatlin, and Petraski believed they had arguable probable cause to arrest Ndi and Dhamala. The Defendant Officers therefore are not entitled to qualified immunity.

## X.    IRFRA (Count V)

Pursuant to the IRFRA:

> [The] [g]overnment may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, unless it demonstrates that application of the burden to the person (i) is in furtherance of a compelling governmental interest and (ii) is the least restrictive means of furthering that compelling governmental interest.

775 Ill. Comp. Stat. 35/15. In the IRFRA context, "the hallmark of a substantial burden on one's free exercise of religion is the presentation of a coercive choice of either abandoning one's free exercise of religious convictions or complying with government regulation." *Baumgartner*, 759 F. Supp. 3d at 879–80 (quoting *Diggs v. Snyder*, 333 Ill. App. 3d 189, 194–95 (2002)). "[W]hether a burden is substantial . . . is ordinarily an issue of fact." *World Outreach Conf. Ctr. v. City of Chicago*, 591 F.3d 531, 539 (7th Cir. 2009) (citations omitted).

Defendants argue that the Court must dismiss Plaintiffs' IRFRA claim because Plaintiffs fail to allege a substantial burden. But as discussed when considering Plaintiffs' free exercise claim, the facts in the amended complaint, taken as true at this preliminary stage, suggest that Defendants' alleged unwritten policy enforcing the Amplification Ordinance against only street preachers substantially burdens Plaintiffs' freedom to practice their religion. Plaintiffs allege that Defendants "prevent[ed] Plaintiffs' use of voice amplification" and "[o]rder[ed] Plaintiffs to cease using amplification." Doc. 17 ¶¶ 127–29. Because of this targeted enforcement, Plaintiffs

23

claim that they must choose between citation and arrest or cessation of their amplified street preaching, which they contend is integral to their religious practice because their "convictions compel them to share their faith publicly." Doc. 17 ¶ 124. Further, Plaintiffs allege that their amplification did not exceed the Amplification Ordinance's maximum volume. *See id.* ¶ 51 ("Throughout this time, the amplitude of the sound remained low. Plaintiffs had a decibel meter with them and measured their volume after the officers left."). Because Plaintiffs have alleged sufficient facts to show the Defendants' unwritten selective enforcement policy amounted to a coercive tactic, which forces them to choose between abandoning their religious convictions or potential citation and arrest, their IRFRA claim can proceed. *See Baumgartner*, 759 F. Supp. 3d at 880 (allowing the plaintiff's IRFRA claim to proceed where the plaintiff alleged sufficient facts to show that the defendants' action at issue constituted a coercive tactic because it forced the plaintiff to abandon his religious convictions).

Defendants also argue that the Tort Immunity Act bars Plaintiffs' IRFRA claim for money damages. Plaintiffs seemingly concede this point because their only response to Defendants' argument is noting that "[e]ven if Plaintiffs cannot obtain monetary damages under the IRFRA, Plaintiffs seek injunctive and declaratory relief that is not subject to the Tort Immunity Act. This relief is essential to prevent future constitutional violations." Doc. 43 at 32. Because Plaintiffs did not substantively respond to Defendants argument, Plaintiffs may not seek monetary damages under their IRFRA claim.

**CONCLUSION**

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss [33]. The Court dismisses Plaintiffs' vagueness, equal protection, and free speech as applied claims without prejudice, but allows Plaintiffs' First Amendment retaliation, free exercise, false arrest, retaliatory arrest, and IRFRA claims to proceed to discovery.

Dated: February 24, 2026

_____
SARA L. ELLIS
United States District Judge